## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| FTX TRADING LTD., MACLAURIN INVESTMENTS LTD., f/k/a ALAMEDA VENTURES LTD., and WEST REALM SHIRES SERVICES, INC., | |
| Plaintiffs, | Adv. Pro. No. 23-_____(JTD) |
| - against - | |
| LAYERZERO LABS LTD., ARI LITAN, and SKIP & GOOSE LLC, | |
| Defendants. | |

### COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548 AND 550, DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502

Plaintiffs FTX Trading Ltd. ("FTX.com"), Maclaurin Investments Ltd., f/k/a/

Alameda Ventures Ltd. ("Alameda Ventures"), and West Realm Shires Services, Inc.

("FTX US") (together, "Plaintiffs"), through their undersigned counsel, for their Complaint

against LayerZero Labs Ltd. ("LayerZero"), Ari Litan ("Litan"), and Skip & Goose LLC

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

("Skip & Goose") (together, "Defendants") allege the following based upon personal knowledge and upon their investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from LayerZero, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs, and all obligations of Plaintiffs to LayerZero made on or around November 8 and 9, 2022, just prior to the commencement of the above-captioned actions (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").  Plaintiffs, on behalf of themselves and their affiliated Debtors, also seek to avoid as preferential transfers all transfers of property to Defendants during the ninety-day period prior to commencement of the Chapter 11 Cases (the "Preference Period").

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for the Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022

[D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3.      From January through May 2022, Alameda Ventures entered into a series of transactions with LayerZero:

- On January 14, 2022 and May 27, 2022, Alameda Ventures paid more than $70 million in two transactions to acquire (i) an approximately 4.92% equity stake in LayerZero and (ii) warrants to purchase, for a de minimis price, substantial allocations of LayerZero's Stargate ("STG") and LayerZero ("ZRO") tokens.

- On March 17, 2022, Alameda Ventures paid $25 million for 100 million STG tokens at a public auction, which were to be delivered over the course of six months starting on March 17, 2023.

4.      On February 4, 2022, in the midst of these transactions, LayerZero loaned $45 million to Alameda Ventures's parent, Alameda Research Ltd. ("Alameda Research"), pursuant to a promissory note that provided for interest at a rate of 8% per annum.

5.      On November 2, 2022, a news organization published what appeared to be Alameda Research's balance sheet, revealing publicly for the first time that Alameda Research's solvency was dependent on the multibillion-dollar valuation that Alameda Research had assigned to its holdings of FTT, a cryptocurrency token issued by the FTX Group, which resulted in customers of the FTX.com and FTX US exchanges withdrawing billions of dollars from the respective exchanges.

6.      On the eve of bankruptcy, after public reports of the FTX Group's[2] liquidity crisis and failed attempts to obtain additional capital, in a desperate attempt to secure last-minute liquidity and prevent their fraud from coming to light, the FTX Insiders (as defined in paragraph 32) caused Alameda Ventures to make transfers, and to incur obligations, to LayerZero as described below.

7.      On November 7, 2022, LayerZero sought to capitalize on Alameda Research's distressed financial position by demanding immediate repayment of its $45 million loan to Alameda Research.  LayerZero was well aware that Alameda Research was facing a liquidity crisis and, within about 24 hours, negotiated a fire-sale transaction with Caroline Ellison, Alameda Research's then-CEO, pursuant to which Alameda Ventures purported to execute a Share Transfer Agreement transferring to LayerZero Alameda Ventures's entire 4.92% equity stake in LayerZero in exchange for LayerZero forgiving its $45 million loan to Alameda Research.  As part of this transaction, Ellison also purported to execute a Cancellation and Rescission Agreement and Mutual Release on behalf of Alameda Ventures, pursuant to which Alameda Ventures relinquished its warrants to purchase STG and ZRO tokens.

8.      LayerZero and Ellison also purported to enter into a Token Purchase Agreement, dated November 9, 2022, pursuant to which LayerZero agreed to pay Alameda Ventures $10 million to buy back from Alameda Ventures the 100 million STG tokens that Alameda Ventures had purchased for $25 million months earlier.  The transfer contemplated by the Token

---

[2]    The "FTX Group" is comprised of four silos.  These silos include:  (a) a group composed of Debtor West Realm Shires, Inc., Plaintiff and Debtor FTX US, and their Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor Alameda Research LLC and its Debtor subsidiaries, including Plaintiff Alameda Ventures; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc., and Debtor FTX Ventures Ltd.; and (d) a group composed of Plaintiff and Debtor FTX.com and its Debtor and non-Debtor subsidiaries.

Purchase Agreement was never completed:  LayerZero did not pay for the tokens, and Alameda

Ventures did not effect their transfer.

       9.     The value that Alameda Ventures transferred to LayerZero through these

last-minute pre-petition transactions far exceeded the value that LayerZero conveyed to Alameda

Ventures:  In exchange for releasing an unsecured $45 million claim against an insolvent entity

(Alameda Research), as to which any potential recoveries would have been both uncertain and in

the future, LayerZero received from Alameda Ventures:  (1) equity valued at nearly $150 million

(based on LayerZero's most recent fundraising round); (2) a warrant entitling Alameda Ventures

to receive approximately 2.5% of the total supply of all STG tokens minted, generated, or

created, or approximately 25 million STG tokens (trading at approximately $0.55/token as of

August 31, 2023) for a de minimis price; and (3) a warrant entitling Alameda Ventures to receive

approximately 4.92% of the total supply of ZRO tokens (if ever launched) for a de minimis price.

The contemplated sale of Alameda Ventures's 100 million STG tokens for just $10 million—

40% of what Alameda Ventures had paid months earlier—also was facially unreasonable and

would have resulted in a grossly disproportionate transfer of value from Alameda Ventures to

LayerZero, demonstrating the inequitable nature of the arrangements that LayerZero negotiated

with Ellison as she was frantically trying to raise cash to keep Alameda Research afloat.

      10.    In a November 10, 2022 letter to its investors, LayerZero all but admitted to

exploiting Alameda Ventures, stating:  "we knew that being extremely well capitalized during a

period like this would present some unique opportunities and these last few days certainly have."

LayerZero explained that it had "worked around the clock for the past 72 hours to structure an

agreement and ha[d] bought FTX/FTX Ventures/Alameda out of 100% of their equity position,

token warrants, and any and all agreements between us," and that LayerZero had "purchased the

locked STG tokens from the community auction that Alameda had," and planned to "let the community decide what to do with them."

11.    After the Debtors had filed the Chapter 11 Cases, LayerZero attempted to circumvent the automatic stay and Chapter 11 claims process and gain control of Alameda Ventures's 100 million STG tokens.  Under the guise of purported "security concerns," LayerZero unilaterally and without authorization by the Debtors attempted to transfer control of the 100 million STG tokens from Alameda Ventures to itself by proposing to reissue these STG tokens to a wallet under the control of LayerZero rather than Alameda Ventures.

12.    Ultimately, after facing the prospect of being sued by the Debtors for violating the automatic stay, LayerZero relented and halted its proposed STG token reissuance.  To date, LayerZero has not interfered with Alameda Ventures's receipt of the unlocked portions of the 100 million STG tokens, which the Debtors have been securing in cold storage wallets.

13.    The transfers made, and obligations incurred, on November 8 and 9, 2022 were fraudulent and are avoidable under Section 548 of the Bankruptcy Code and Title 6 of the Delaware Code.  Alameda Ventures's transfers of equity pursuant to the Share Transfer Agreement and rescission of the warrants for STG and ZRO tokens pursuant to the Cancellation and Rescission Agreement and Mutual Release also constitute preferential transfers that are avoidable under Section 547 of the Bankruptcy Code.

14.    In addition, FTX.com asserts a preference claim against LayerZero with respect to certain withdrawals from LayerZero's FTX.com exchange account during the Preference Period. Based on currently-available information, during the Preference Period, LayerZero received the benefit of withdrawals from its FTX.com account of approximately 152,500.05 APT, 406.47 AVAX, 71.81 BNB, 650.00 BUSD, 1,844.82 ETH, 7,205.00 FTM, 9,390.51 MATIC,

13,375,477.44 USDC, and 4,096,492.50 USDT, as set forth in **Exhibit A** (the "LayerZero

Exchange Withdrawals").  Those withdrawals constitute preferential transfers and are avoidable

under Section 547 of the Bankruptcy Code.  Based on pricing as of August 31, 2023, those assets

are collectively valued at approximately $21.37 million.[3]  FTX.com's preference claims against

LayerZero may be subject to a "subsequent new value" defense of approximately $79 arising

from deposits into LayerZero's FTX.com account subsequent to these preferential transfers.

15.     The LayerZero account on the FTX.com exchange was created using the

LayerZero email address of Ari Litan, a senior LayerZero employee and defendant in this action.

16.     LayerZero's withdrawals during the Preference Period included more than

$5 million withdrawn on November 7, 2022—just one day before the FTX.com exchange halted

customer withdrawals.  LayerZero was thus seeking, on the one hand, to exploit the FTX

Group's liquidity crisis by negotiating unfair terms for the purported agreements with Alameda

Ventures on November 8 and 9, 2022, while, on the other hand, withdrawing assets from the

FTX.com exchange, exacerbating the liquidity crisis.

17.     FTX US also asserts a preference claim against Litan—a current strategic advisor

and former chief operating officer at LayerZero—with respect to certain withdrawals from

Litan's FTX US exchange account during the Preference Period.  Based on currently-available

information, during the Preference Period, Litan received the benefit of withdrawals from his

FTX US account of approximately 504.01 BTC, as set forth in **Exhibit B** (the "Litan Exchange

---

[3]     Plaintiffs have selected August 31, 2023 solely for indicative spot pricing of a present day judgment in this
Complaint.  In accordance with section 550(a) of the Bankruptcy Code, Plaintiffs may seek either (i) recovery
of the transferred cryptocurrencies or (ii) the higher of such cryptocurrencies' fair market value as of either (a)
the time of payment resulting from any final resolution of the Complaint or (b) the date of such transfers to
return their estates to the position that they would have enjoyed if the transfers had not occurred.  Given the
volatility of cryptocurrency values, Plaintiffs reserve all rights with respect to the appropriate pricing date—
whether that date should be the transfer date or the date when repaid.

Withdrawals"), all of which took place on November 8 and 9, 2022, just days prior to the

FTX US exchange halting withdrawals.  Those withdrawals constitute preferential transfers and

are avoidable under Section 547 of the Bankruptcy Code.  Based on pricing as of August 31,

2023, those assets are collectively valued at approximately $13.07 million.[4]  FTX US's

preference claims against Litan are not subject to a "subsequent new value" defense as Litan

made no subsequent deposits.

18.    FTX US also asserts a preference claim against Skip & Goose—a limited liability

company owned solely by Litan—with respect to certain withdrawals from Skip & Goose's

exchange account during the Preference Period.  Based on currently-available information,

during the Preference Period, Skip & Goose received the benefit of withdrawals from its FTX

US account of approximately 3,848,928.19 USDC, 2,700.00 ETH and $250,000.00 of USD fiat,

as set forth in **Exhibit C** (the "Skip & Goose Exchange Withdrawals"), a substantial portion of

which was transferred on November 7 and 8, 2022, just days prior to the FTX US exchange

halting withdrawals.  Those withdrawals constitute preferential transfers and are avoidable under

Section 547 of the Bankruptcy Code.  Based on pricing as of August 31, 2023, those assets are

collectively valued at approximately $8.54 million.[5]  FTX US's preference claims against Skip

& Goose may be subject to a "subsequent new value" defense of approximately $1.90 million

arising from deposits into Skip & Goose's FTX US account subsequent to these preferential

---

[4]    *See supra* n. 3.

[5]    *See supra* n. 3.

transfers.

19.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to

disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and

until Defendants have relinquished to Plaintiffs all property that Defendants received in transfers

and all obligations incurred that are determined by the Court to be avoidable and/or recoverable.

20.     To date, LayerZero has filed three claims against the Debtors' Chapter 11 estates.

These include claims for (i) enforcement of the Token Purchase Agreement, dated November 9,

2022, pursuant to which LayerZero agreed to pay Alameda Ventures $10 million to buy back

from Alameda Ventures the 100 million STG tokens; (ii) unpaid interest purportedly accrued in

connection with Alameda Research's $45 million loan from LayerZero; and (iii) a customer

entitlement based on approximately $12 million in assets reflected in LayerZero's FTX.com

account balance on the Petition Date.  The Court should disallow all of these claims.

21.     During the course of this adversary proceeding, Plaintiffs may learn (through

formal discovery or otherwise) of additional transfers made to, or obligations incurred by,

Defendants that are avoidable and/or recoverable under the Bankruptcy Code.  Plaintiffs intend

to avoid and/or recover all such transfers and obligations made to or for the benefit of

Defendants or any other transferee and accordingly reserve the right to amend this Complaint.

## THE PARTIES

22.     Plaintiff FTX Trading Ltd. is a corporation registered in Antigua and Barbuda that

conducted business as FTX.com and operated a digital asset trading exchange.  Its principal

place of business was in Nassau, Bahamas.  FTX.com is 80% owned by Paper Bird Inc., a

Delaware corporation that is wholly owned by Samuel Bankman-Fried.

23.     Plaintiff Maclaurin Investments Ltd., formerly known as Alameda Ventures Ltd.,

is a limited company incorporated in the Seychelles.  It is a wholly-owned subsidiary of Alameda Research, which is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Gary Wang.

24.     Plaintiff West Realm Shires Services, Inc., doing business as FTX US, is a Delaware corporation.  It is a wholly-owned subsidiary of West Realm Shires, Inc. ("WRS"), which is a Delaware corporation 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Nishad Singh, and 22.25% owned by other shareholders.

25.     Defendant LayerZero is a British Virgin Islands company limited by shares. LayerZero has a United States subsidiary incorporated in Delaware named "LayerZero Labs US Inc."

26.     Defendant Ari Litan is the former chief operating officer, and a current strategic advisor, of LayerZero.  Litan resides in Florida.  As discussed in paragraphs 69-72, Litan opened two accounts on the FTX US exchange—one in his name and one in the name of Skip & Goose—and his email was used for LayerZero's corporate FTX.com exchange account.

27.     Defendant Skip & Goose is a limited liability company incorporated in Kansas. Litan has a 100% interest in Skip & Goose and is its only member.  Litan represented, in creating an FTX US account for Skip & Goose, that he was the source of funds for Skip & Goose.

## OTHER RELEVANT PERSONS

28.     Samuel Bankman-Fried is a co-founder of FTX.com, FTX US, WRS, Alameda Research, and Alameda Ventures, and at all relevant times controlled Plaintiffs through his majority ownership stakes in their ultimate parent companies.

29.     Caroline Ellison was the co-Chief Executive Officer of Alameda Research from August 2021 until September 2022, when she was named the sole CEO.  Ellison also served as the CEO of Alameda Ventures.

30.     Nishad Singh was the former Director of Engineering at FTX.com.  Singh was also the Chief Security Officer and Chief Engineer of WRS.

31.     Zixiao "Gary" Wang was a co-founder of FTX.com and its former Chief Technology Officer.  Wang was also the Chief Technology Officer of WRS.

32.     Bankman-Fried, Wang, Singh, and Ellison are collectively referred to herein as the "FTX Insiders."

## JURISDICTION AND VENUE

33.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

34.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

35.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

36.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

37.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

38.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 547, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

39.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of a final order or judgment by the Court on these claims to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

### I.     The FTX Insiders' Fraudulent Scheme

40.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First*

*Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

41.     As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  The FTX Insiders used this deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.

42.     The FTX Insiders funded much of this spending through Alameda Research, which, at the FTX Insiders' direction, unlawfully commingled and diverted FTX Group assets to the FTX Insiders' pet projects.  In doing so, the FTX Insiders defrauded the FTX Group's customers, creditors, and shareholders, and violated their fiduciary duties and numerous laws.

43.     The FTX Insiders' conduct is currently the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the Commodity Futures Trading Commission, and investigations by a host of regulators.  All of the FTX Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.  On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022).  On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison as well as conspiracy to make unlawful political contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28, 2023,

*United States* v. *Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022).

44.     In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda Research "special privileges on the FTX platform," including to allow Alameda Research unfettered use of assets on the FTX.com exchange, even while Alameda Research maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and cryptocurrencies.  Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022).  Using these "special privileges," the FTX Insiders frequently caused Alameda Research to misappropriate funds from the FTX.com exchange for their own benefit.

45.     In the days leading up to the Petition Date, Bankman-Fried supplied potential investors with a purported Alameda Research balance sheet that included a liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account."  *See* Superseding Indictment ¶ 56, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.  However, Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda Research's bank accounts that had not been maintained for the benefit of customers or repaid to FTX[.]"  *Id*. ¶ 57.  The FTX Insiders used these funds "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda."  *Id*. ¶ 26.

46.     Ellison "understood that FTX would need to use customer funds" to make many of its investments, Plea Tr. 28:1-4, *United States* v. *Ellison*, 22 cr-00673 (S.D.N.Y. 2022), ECF No. 19, and admitted that many investments "were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds."  *Id*. at 28:22–29:1.

47.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda Research to "borrow" billions of dollars from FTX.com in order to, inter alia, finance "loans" from Alameda Research to the FTX Insiders.  Ellison admitted that from 2019 through 2022 she was aware of this arrangement, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols."  *Id*. at 27:11-15.

48.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another."  *See* Superseding Indictment ¶ 53, *United States* v. *Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II.     Alameda Ventures's Investments in LayerZero and Alameda Research's Loans from LayerZero and Litan

49.     Using misappropriated FTX Group funds, Alameda Ventures entered into the transactions with LayerZero that are the subject of this action.  These agreements were made as Ellison and FTX Group employees shared close, personal friendships with LayerZero's founders and LayerZero employees, including Litan.  For example, the FTX Group arranged for accommodations for several months in the Bahamas for a dozen LayerZero employees and their families and dogs.  The FTX Group also hosted nearly two dozen LayerZero employees and their family members at a 2022 Super Bowl party and arranged for LayerZero employees to receive tickets to various events, including a Miami Heat basketball playoff game.

50.     **Equity Purchases**:  Alameda Ventures entered into two agreements to purchase equity in LayerZero.  On January 14, 2022, Alameda Ventures purchased 2,988,553 Series A-1

Preference Shares of LayerZero for $39,999,988.78.  The share price was based on a $1 billion valuation of LayerZero.  On May 27, 2022, Alameda Ventures purchased an additional 762,384 Ordinary Shares of LayerZero for $29,999,985.75, based on a $3 billion valuation of LayerZero. As a result of these equity purchases, Alameda Ventures held a 4.92% stake in LayerZero, valued at nearly $150 million based on LayerZero's most recent fundraising round.

51.     **Token Warrants**:  On January 14, 2022, Alameda Ventures also entered into two warrant agreements with LayerZero, entitling Alameda Ventures to purchase STG tokens (the "STG Warrant") and ZRO tokens (the "ZRO Warrant.").  The STG Warrant agreement entitled Alameda Ventures to receive, for the nominal sum of approximately $3,000, an allocation of STG tokens calculated using a formula incorporating Alameda Ventures's proportionate equity stake in LayerZero.  Alameda Ventures's 4.92% equity stake would translate to approximately 2.5% of the total supply of all STG tokens minted, generated or created, or approximately 25 million STG tokens, which are trading at approximately $0.55/token as of August 31, 2023. Alameda Ventures has not exercised the STG Warrant.

52.     Although the ZRO token has not yet launched, the ZRO Warrant operates similarly to the STG Warrant, except that Alameda Ventures would be entitled to receive approximately 4.92% (not 2.5%) of the total supply of ZRO tokens minted, generated, or created (if ever launched) for a de minimis price.

53.     **STG Token Purchase at Auction**:  Alameda Ventures purchased 100 million STG tokens for $25 million at a public auction held on March 17, 2022.  As part of the terms of the auction, these 100 million STG tokens were locked for one year and were thereafter subject to a six-month vesting period, starting on March 17, 2023.

54.     **$45 Million Loan Agreement**:  On February 4, 2022, Alameda Research entered

into an agreement with LayerZero whereby Alameda Research borrowed $45 million at 8%

annual interest.  The loan was for an open term and did not have a maturity date.

55.     **420 Bitcoin Loan Agreement:**  While not the subject of relief Plaintiffs seek in

connection with this action, on February 11, 2022, around the same time as the $45 million loan

from LayerZero, Litan also provided a loan to Alameda Research in his personal capacity for

420 bitcoin at 2% annual interest.  Alameda Research repaid the principal and interest on this

loan on June 15, 2022.

| III. | LayerZero Took Advantage of the FTX Group's Desperate Need for Cash to Effect the Fraudulent and Preferential Transfers |
|------|------|

56.     On November 2, 2022, a news organization leaked what appeared to be Alameda

Research's balance sheet, revealing publicly for the first time that Alameda Research's solvency

was dependent on the multibillion-dollar valuation that Alameda Research had assigned to its

holdings of FTT, a cryptocurrency token issued by the FTX Group.  Following this revelation,

substantial numbers of FTX.com and FTX US customers began withdrawing their funds from the

FTX.com and FTX US exchanges amid growing concerns about the FTX Group's leverage and

solvency.  On November 6, the FTX Group's primary competitor, Binance, announced it would

be liquidating its sizeable holdings of FTT, further alarming FTX.com customers and creating a

full-blown liquidity crisis at the FTX Group.

57.     By November 7, the FTX Group's problems were well known, with news articles

reporting on the "mass exiting" of assets from the exchanges.[6]  That same day, as

Bankman-Fried, Ellison and others raced to cover up their misappropriation of customer assets,

---

[6]     Andrew Asmakov, *Investors Withdraw Millions From FTX as Binance Begins Liquidating FTT Token*, DECRYPT (Nov. 7, 2022), https://decrypt.co/113723/investors-withdrawal-millions-from-ftx-binance-begins-liquidating-ftt-token.

LayerZero pounced, calling its outstanding loan to Alameda Research, which by that time had a

balance of approximately $46.44 million,[7] thereby exacerbating the FTX Group's liquidity crisis.

58.    By November 8, FTX.com no longer had sufficient funds to meet the pace of

customer withdrawals, as news outlets reported that FTX.com saw $6 billion in customer

withdrawals in just 72 hours.  On November 8, Bankman-Fried wrote in a message to staff that

"in the last 72 hours, we've had roughly $6b of net withdrawals from FTX" and that customer

withdrawals from FTX.com were "effectively paused."  When a last-ditch proposal to sell the

FTX Group's non-US businesses to Binance fell through on November 9, the pace of the

FTX Group's collapse accelerated.[8]  By November 10, Bahamian regulators had frozen the

assets of the FTX Group's Bahamian affiliate, Bankman-Fried had admitted that the FTX.com

exchange faced a liquidity crisis, and Alameda Research LLC had announced that it was winding

down.[9]  On November 11 and 14, the Debtors filed voluntary petitions for relief under

Chapter 11 of the Bankruptcy Code.

59.    Taking advantage of the FTX Group's financial crisis, LayerZero was able to

extract an agreement extremely favorable to LayerZero and deeply unfavorable to Alameda

Ventures, which involved (i) Alameda Ventures relinquishing its valuable equity stake in

LayerZero, the STG Warrant, and the ZRO Warrant in exchange for forgiveness of Alameda

---

[7]    On June 16, 2022, Alameda Research made an interest payment of approximately $1.28 million to LayerZero.

[8]    Kevin Reynolds, *Binance Walks Away From Deal to Acquire FTX*, CoinDesk (Nov. 9, 2022), https://www.coindesk.com/business/2022/11/09/binance-walks-away-from-ftx-deal-wsj/.

[9]    Nelson Wang, *FTX Assets Frozen by Bahamian Regulator*, CoinDesk (Nov. 10, 2022), https://www.coindesk.com/business/2022/11/10/ftx-digital-markets-assets-frozen-by-bahamian-regulator-bloomberg/; MacKenzie Sigalos, *Crypto billionaire Sam Bankman-Fried blames himself for FTX's collapse, admits he 'f---ed up'*, CNBC (Nov. 10, 2022), https://www.cnbc.com/2022/11/10/crypto-billionaire-sam-bankman-fried-blames-himself-for-ftxs-collapse-admits-he-f-ed-up.html.

Research's loan from LayerZero (the "Alameda Transfers"), and (ii) LayerZero agreeing to purportedly purchase Alameda Ventures's 100 million STG tokens for $10 million.

60.     On November 8, 2022, Alameda Ventures and LayerZero purported to enter into a Share Transfer Agreement, pursuant to which Alameda Ventures purported to transfer to LayerZero its entire 4.92% equity stake in LayerZero in exchange for LayerZero forgiving the $45 million loan to Alameda Research.  Pursuant to this agreement, LayerZero received equity valued at nearly $150 million (based on LayerZero's most recent fundraising round) in exchange for forgiveness of its $45 million loan.  This loan was an unsecured $45 million claim against an insolvent entity, where recoveries would be both uncertain and in the future.

61.     Also on November 8, as part of the same transaction, LayerZero and Alameda Ventures purported to enter into the Cancellation and Rescission Agreement and Mutual Release, pursuant to which Alameda Ventures gave up its rights under the STG Warrant and the ZRO Warrant to purchase millions of dollars' worth of those tokens for de minimis amounts.

62.     On November 9, 2022, as part of the same transaction, LayerZero and Alameda Ventures also purported to enter into a Token Purchase Agreement, pursuant to which LayerZero agreed to pay Alameda Ventures $10 million to purchase the 100 million STG tokens that Alameda Ventures had purchased at auction earlier that year for $25 million.  This was a mere 40% of the $25 million that Alameda Ventures had paid to acquire the STG tokens, and would have permitted LayerZero to get paid before Alameda Ventures went into bankruptcy. LayerZero did not transfer the $10 million to Alameda Ventures for the 100 million STG tokens before the Chapter 11 Cases were commenced, and Alameda Ventures never transferred the 100 million STG tokens to LayerZero.

63. After trying, but failing, to empty LayerZero's FTX.com account on November 8 and 10, 2022 (as discussed in more detail in Section V) and after Plaintiffs filed the Chapter 11 Cases, LayerZero continued to press Alameda Ventures to conclude the transfer of tokens by using as payment—or "offsetting"—the balance it was unsuccessful in withdrawing from FTX.com as the consideration it owed Alameda Ventures under the Token Purchase Agreement. In other words, LayerZero not only drove an unfair bargain with Alameda Ventures, but then tried to jump the line of creditors by using the stated balance of its FTX.com account to try to complete the purported purchase of the 100 million STG tokens.

## IV.  The Alameda Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent To Hinder, Delay, or Defraud Creditors.

64. As set forth above, multiple badges of fraud recognized by the Bankruptcy Code and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers and obligations described herein, including that:

i. The FTX Insiders removed or concealed Alameda Ventures's assets;

ii. The value of the consideration received by Alameda Ventures was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

iii. Alameda Ventures was insolvent when, or became insolvent shortly after, the transfers were made;

iv. The transfers occurred shortly before or shortly after Alameda Ventures incurred substantial debts; and

v. The transfers were made at the behest of creditors who knew that the FTX Group was under extreme financial distress, and leveraged that distress to extract disproportionate value from Alameda Ventures.

## V.  Plaintiffs' Preferential Transfers to LayerZero

65. Alameda Ventures transferred its equity and token warrants to LayerZero pursuant to the Share Transfer Agreement and Cancellation and Rescission Agreement and

Mutual Release, respectively, just days before the Petition Date.

66.     In addition, LayerZero maintained a customer account on the FTX.com exchange (Acct No. ending in -7839).  In creating that account, LayerZero submitted its corporate documents as part of the know-your-customer process.  During the Preference Period, LayerZero received the benefit of certain withdrawals of digital assets from that account as set forth in **Exhibit A**.  Based on pricing as of August 31, 2023, those assets are collectively valued at approximately $21.37 million.

67.     LayerZero's withdrawals during the Preference Period included more than $5 million withdrawn on November 7, 2022—the same day that LayerZero called its $45 million loan and just one day before the FTX.com exchange halted customer withdrawals.  LayerZero also attempted to withdraw all of the remaining funds from its FTX.com account on November 8 and 10, 2022, but those attempts were unsuccessful.

68.     In accordance with Bankruptcy Code Section 547(b), after analyzing available information, Alameda Ventures hereby seeks to avoid as preference payments the November 8 and 9, 2022 transfers of equity and warrants, and FTX.com seeks to avoid as preference payments the LayerZero Exchange Withdrawals set forth in **Exhibit A**.  Alameda Ventures and FTX.com reasonably believe that all such transfers are preferential transfers and avoidable under Section 547 of the Bankruptcy Code after giving effect to LayerZero's known or reasonably knowable affirmative defenses.

**VI.      Plaintiffs' Preferential Transfers to Litan and Skip & Goose**

69.     Litan maintained a customer account on the FTX US exchange (Acct No. ending in -4764).  During the Preference Period (and in particular, on November 8 and 9, 2022), Litan received the benefit of certain withdrawals of digital assets from that account as set forth in **Exhibit B**.  Based on pricing as of August 31, 2023, those assets are collectively valued at

approximately $13.07 million.

70.    Skip & Goose also maintained a customer account on the FTX US exchange (Acct No. ending in -8285).  During the Preference Period (and in particular, on November 8, 2022), Skip & Goose received the benefit of certain withdrawals of digital assets from that account as set forth in **Exhibit C**.  Based on pricing as of August 31, 2023, those assets are collectively valued at approximately $8.54 million.

71.    On November 8, 2022, the FTX.com exchange halted customer withdrawals and, on November 11, 2022, the FTX US exchange halted customer withdrawals.

72.    In accordance with Bankruptcy Code Section 547(b), after analyzing available information, FTX US seeks to avoid as preference payments the Litan and Skip & Goose Exchange Withdrawals set forth in **Exhibits B and C**.  FTX US reasonably believes that all such transfers are preferential transfers and avoidable under Section 547 of the Bankruptcy Code after giving effect to Litan's and Skip & Goose's known or reasonably knowable affirmative defenses.

**VII.    The Transfers Set Forth Herein Were Made When Plaintiffs Were Insolvent, and the FTX Insiders and Defendants Knew It.**

73.    The FTX Insiders' misconduct, including that described in paragraphs 40-48 and 56-58, caused the FTX Group to suffer extreme financial distress in the lead-up to the Petition Date.

74.    At the time Alameda Ventures entered the November 2022 agreements with LayerZero, just days before the Petition Date, Alameda Ventures:  (1) was insolvent or became insolvent as a result of the transfers; (2) was engaged in a business or a transaction for which any property remaining with Alameda Ventures was an unreasonably small capital; or (3) intended to incur, or believed that it would incur, debts that would be beyond Alameda Ventures's ability to repay as such debts matured.  At the time of the LayerZero, Litan, and Skip & Goose Exchange

Withdrawals, FTX.com and FTX US, respectively, also were insolvent.

75.     As Singh admitted in his guilty plea, by "early September 2022," Alameda

Research "could not repay what it owed."  *See* Plea Tr. 29:2-3, ECF No. 102, *United States* v.

*Singh*, 22-cr-00673 (S.D.N.Y. 2022).  Ellison also made similar admissions in her guilty plea,

stating that from 2019 through 2022, Alameda Research used FTX Group funds to finance

investments or repay loans.  Plea Tr. 27:11-29:1, ECF No. 19, *United States* v. *Ellison*,

22-cr-00673 (S.D.N.Y. 2022).

76.     By November 8, 2022, the FTX Group no longer had enough funds to fulfill

customer withdrawals as customers had withdrawn $6 billion in the prior 72 hours, and FTX.com

then halted customer withdrawals.  On November 11, 2022, FTX US halted customer

withdrawals.

## CAUSES OF ACTION

### COUNT ONE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(A)
### (AGAINST LAYERZERO)

77.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully

set forth here.

78.     Alameda Ventures made the Alameda Transfers as described herein.  Each of the

Alameda Transfers was a transfer of property of Plaintiffs or an obligation to LayerZero that was

incurred by Plaintiffs.

79.     Each of the Alameda Transfers was made with the intent to hinder, delay, or

defraud present or future creditors.

80.     Accordingly, each of the Alameda Transfers should be avoided as fraudulent

pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from

LayerZero the full amount of such transfers and obligations, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT TWO
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## 11 U.S.C. § 548(a)(1)(B)
## (AGAINST LAYERZERO)

81.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

82.     Alameda Ventures made the Alameda Transfers as described herein.  Each of the Alameda Transfers was a transfer of property of Plaintiffs or an obligation to LayerZero that was incurred by Plaintiffs.

83.     Alameda Ventures did not receive reasonably equivalent value in exchange for any of the Alameda Transfers.

84.     Alameda Ventures (1) was insolvent on the date that each transfer and obligation was made or became insolvent as a result of these transfers; (2) was engaged in a business or a transaction for which any property remaining with Alameda Ventures was an unreasonably small capital; or (3) intended to incur, or believed that it would incur, debts that would be beyond Alameda Ventures's ability to repay as such debts matured.

85.     Accordingly, each of the Alameda Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from LayerZero the full amount of such transfers and obligations, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## 6 DEL. CODE ANN. § 1304(a)(1) AND 11 U.S.C. § 544(b)
## (AGAINST LAYERZERO)

86.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

87.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit., § 1301, *et seq*.

88.     Alameda Ventures made the Alameda Transfers as described herein.  Each of the Alameda Transfers was a transfer of property of Plaintiffs or an obligation to LayerZero that was incurred by Plaintiffs.

89.     Each of the Alameda Transfers was made with the intent to hinder, delay, or defraud the Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims.  Each of the Alameda Transfers is avoidable by creditors who hold allowable unsecured claims.

90.     Accordingly, each of the Alameda Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from LayerZero the full amount of such transfers and obligations, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**6 DEL. CODE ANN. §§ 1304(a)(2) and 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST LAYERZERO)**

91.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

92.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

93.     Alameda Ventures made the Alameda Transfers as described herein.  Each of the Alameda Transfers was a transfer of property of Plaintiffs or an obligation to LayerZero that was incurred by Plaintiffs.

94.     Alameda Ventures did not receive reasonably equivalent value in exchange for any of the Alameda Transfers.

95.     Alameda Ventures (1) was insolvent on the date that each transfer and obligation was made or became insolvent as a result of these transfers and obligations; (2) engaged or was about to engage in a business or a transaction for which the remaining assets of Alameda Ventures were unreasonably small in relation to the business or transaction; or (3) intended to incur, believed that it would incur, or reasonably should have believed that it would incur, debts that would be beyond Alameda Ventures's ability to repay as such debts became due.

96.     Each of the Alameda Transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers and obligations.

97.     Accordingly, each of the Alameda Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from LayerZero the full amount of such transfers and obligations, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT FIVE
### PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)
### (AGAINST LAYERZERO; EQUITY AND WARRANTS)

98.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

99.     Alameda Ventures transferred the LayerZero equity and token warrants to LayerZero on November 8, 2022, during the Preference Period.

100.    The transfers were made to benefit LayerZero.

101.    With respect to each of the transfers made to LayerZero, LayerZero was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, LayerZero received such transfers for the benefit of a creditor or creditors of Plaintiffs.

102.    Each of the transfers to LayerZero was made on account of an antecedent debt, namely, the $45 million loan that LayerZero had made to Alameda Research.

103.    Each of the transfers was made within ninety days of the Petition Date.

104.    Each of the transfers was made while Alameda Ventures was insolvent.

105.    Each of these transfers enabled LayerZero to receive more than it would have received if: (i) Plaintiffs' Chapter 11 Case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amount paid to LayerZero on account of the debt was determined by the Bankruptcy Code.

106.    LayerZero has not returned any of the transfers made to it by Alameda Ventures

during the Preference Period.

107.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

108.     Accordingly, each of these transfers should be avoided as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from LayerZero the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT SIX**
**PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST LAYERZERO; EXCHANGE WITHDRAWALS)**

109.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

110.     LayerZero made the LayerZero Exchange Withdrawals, which constituted transfers from FTX.com during the Preference Period, as more specifically described in **Exhibit A**.  These transfers were of property of FTX.com.

111.     The transfers were made to benefit LayerZero.

112.     With respect to each of the transfers made to LayerZero, LayerZero was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, LayerZero received such transfers for the benefit of a creditor or creditors of Plaintiffs.

113.     Each of the transfers to LayerZero was made on account of an antecedent debt, namely, FTX.com's obligation to deliver to LayerZero the cryptocurrency or cash balances in LayerZero's FTX.com account.

Case 23-50492-JTD    Doc 1    Filed 09/08/23    Page 29 of 35

114.    Each of the transfers was made within ninety days of the Petition Date.

115.    Each of the transfers was made while FTX.com was insolvent.

116.    Each of the transfers enabled LayerZero to receive more than it would have received if:  (i) Plaintiffs' Chapter 11 Case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amount paid to LayerZero on account of the debt was determined by the Bankruptcy Code.

117.    LayerZero has not returned any of the transfers made to it by FTX.com during the Preference Period.

118.    Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

119.    Accordingly, each of these transfers should be avoided as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from LayerZero the full amount of the transfers,[10] plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT SEVEN
## PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)
### (AGAINST LITAN)

120.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

121.    Litan made the Litan Exchange Withdrawals, which constituted transfers from FTX US during the Preference Period, as more specifically described in **Exhibit B**.  These

---

[10]    *See supra* n. 3.

transfers were of property of FTX US.

122.    The transfers were made to benefit Litan.

123.    With respect to each of the transfers made to Litan, Litan was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, Litan received such transfers for the benefit of a creditor or creditors of Plaintiffs.

124.    Each of the transfers to Litan was made on account of an antecedent debt, namely, FTX US's obligation to deliver to Litan the cryptocurrency or cash balances in Litan's FTX US account.

125.    Each of the transfers was made within ninety days of the Petition Date.

126.    Each of the transfers was made while FTX US was insolvent.

127.    Each of the transfers enabled Litan to receive more than he would have received if:  (i) Plaintiffs' Chapter 11 Case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amount paid to Litan on account of the debt was determined by the Bankruptcy Code.

128.    Litan has not returned any of the transfers made to him by FTX US during the Preference Period.

129.    Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

130.    Accordingly, each of these transfers should be avoided as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Litan the

full amount of the transfers,[11] plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT EIGHT
### PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)
### (AGAINST SKIP & GOOSE)

131.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

132.   Skip & Goose made the Skip & Goose Exchange Withdrawals, which constituted transfers from FTX US during the Preference Period, as more specifically described in **Exhibit C**.  These transfers were of property of FTX US.

133.   The transfers were made to benefit Skip & Goose.

134.   With respect to each of the transfers made to Skip & Goose, Skip & Goose was a creditor of Plaintiffs (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, Skip & Goose received such transfers for the benefit of a creditor or creditors of Plaintiffs.

135.   Each of the transfers to Skip & Goose was made on account of an antecedent debt, namely, FTX US's obligation to deliver to Skip & Goose the cryptocurrency or cash balances in Skip & Goose's FTX US account.

136.   Each of the transfers was made within ninety days of the Petition Date.

137.   Each of the transfers was made while FTX US was insolvent.

138.   Each of the transfers enabled Skip & Goose to receive more than it would have received if:  (i) Plaintiffs' Chapter 11 Case was a case under Chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the amount paid to Skip & Goose on account of the

---

[11]   *See supra* n. 3.

debt was determined by the Bankruptcy Code.

139.     Skip & Goose has not returned any of the transfers made to it by FTX US during the Preference Period.

140.     Pursuant to 11 U.S.C. § 547(b), Plaintiffs have undertaken reasonable due diligence under the circumstances of the case and have taken into account known or reasonably knowable affirmative defenses and believe that these transfers are avoidable.

141.     Accordingly, each of these transfers should be avoided as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code, and Plaintiffs may recover from Skip & Goose the full amount of the transfers,[12] plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT NINE
### DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
### (AGAINST ALL DEFENDANTS)

142.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

143.     As alleged above, Defendants are the transferees of transfers avoidable under Sections 544, 547 and 548 of the Bankruptcy Code and the entity from which property is recoverable under Section 550 of the Bankruptcy Code.

144.     By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants relinquish to Plaintiffs the property transferred or have paid Plaintiffs the value of such transferred property, for which and

---

[12]  *See supra* n. 3.

to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550. This includes but is not limited to the three claims LayerZero has filed with the Debtors' Chapter 11 estates.

**COUNT TEN**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST ALL DEFENDANTS)**

145.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 76 as if fully set forth here.

146.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

147.    Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

148.    Enter an order that the transfers and obligations addressed herein are avoidable fraudulent transfers and obligations, and preferences under 11 U.S.C. §§ 544, 547, 548, and 550, and Del. Code Ann. tit. 6, §§ 1304 and 1305;

149.    Award Plaintiffs (a) the return of property to the Debtors' estates that is the subject of the avoidable fraudulent transfers and preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable fraudulent and preferential transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to Defendants

during the Preference Period);

150.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have turned over to Plaintiffs the amount ordered as an award;

151.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

152.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated:  September 8, 2023
         Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail:  holleys@sullcrom.com
      wheelers@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com

Anthony J. Lewis  (admitted *pro hac vice*)
1888 Century Park East
Los Angeles, CA 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800
E-mail:  lewisan@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*